IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| MARCUS E ADAMS Pro se | § | |
| Vs. | § | |
| INDIVIOR INC. (aka Reckitt Benckiser | § | |
| Pharmaceuticals Inc.) and | § | DEMAND JURY TRIAL |
| INDIVIOR PLC | § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

**TO THE HONORABLE UNITED STATES DISTRICT COURT JUDGE:**

*NOW COMES Plaintiff, Marcus E. Adams,* Pro se filing this original complaint, bringing

this action against Indivior INC. (aka Reckitt Benckiser Pharmaceuticals Inc.) (and Indivior PLC.)

Said Defendants marketed a product to be a relief from opiate addiction, but this product has even

more addictive combined medicinal additives known as (**Buprenorphine, and Naloxone**).

## INTRODUCTION

1.      This action is to recover damages due to the aggressive addiction of *Suboxone sublingual*

*strips* containing (Buprenorphine and Naloxone) 8mg/2mg. The company Reckitt Benckiser

falsely and knowingly claimed that *Suboxone* was an opiate blocker and would safely remove the

person from opiate addiction. Being addicted to *Suboxone* is far worse than Oxycontin, Vicodin

and or Tramadol. The withdrawal symptoms last up to months, now that's 3 times longer than

opiates, plus *Suboxone* causes breathing problems even with the correct dosages prescribed by

your physician after taking it for a long period of time.

2.    According to the F.C.A. False Claims Act, 31 U.S.C. § 3729 also known as the Lincoln Law is Federal and protects United States Citizens from fraudulent companies who defraud the people governed under Lincoln Law.

3.    The opioid epidemic happened over decades and continued to thrive with no solution in the near future until Indivior INC. and Indivior PLC. along with other opioid manufacturers, mislead doctors and the public about the need for and addictive nature of opioid drugs. These manufactures spent years pushing this fraudulent scheme to a market of naive physicians and patients.

4.    When it became clear that entire regions of the country were being devastated by addiction to these powerful drugs (**Buprenorphine and Naloxone**) also known as *Suboxone,* the Manufacturer Defendants ignored what was taking place, a far worse addiction while collecting billions of dollars.

## JURISDICTION AND VENUE

5.    This court has jurisdiction over this action pursuant to 31 U.S.C. §3732 and otherwise have jurisdiction under 28 U.S.C. §1331 and 1345. This court has subject matter jurisdiction over the claims brought under the respective state F.C.A. false claims acts identified herein and which are filed by Plaintiff, Pro se. Venue is proper in the Southern District of Texas, Corpus Christi Division, as this is the district where the claim arose in accordance to U.S.C. § 1391(b).

## PARTIES

6.     Plaintiff Marcus E. Adams (herein after "Marcus E. Adams") is a resident of the City of

Taft, Texas, San Patricio County.

7.     Defendant[s] Reckitt Benckiser, Inc. ("RBI") is a Delaware corporation with its principal

place of business located at Morris Corporate Center IV, 399 Interpace Parkway, Parsippany,

New Jersey 07054. RBI manufactures and sells various products throughout the United States

including pharmaceuticals. RBI was duly authorized to conduct business within the

Commonwealth of Virginia at all times relevant to this matter.

8.     Reckitt Benckiser, LLC ("RBL") is a Delaware limited liability company and maintains

its principal place of business at Morris Corporate Center IV, 399 Interpace Parkway, Parsip-

pany, New Jersey 07054. RBL manufactures and sells various products, including pharmaceuti-

cals. RBL was duly authorized to conduct business within the Commonwealth of  Virginia at all

times relevant to this matter.

9.     Reckitt Benckiser Pharmaceuticals, Inc. ("RBP") is a Delaware corporation and maintains

its principal place of business at 10710 Midlothian Turnpike, Suite 430, Richmond, Virginia

23235. RBP manufactures and sells, or at times relevant to this Complaint, manufactured and

sold, various products throughout the United States, including pharmaceuticals. RBP was duly

authorized to conduct business within the Commonwealth of

Virginia at all times relevant to this matter.

10.     Reckitt Benckiser Healthcare (UK) Ltd. ("RBH") is a British corporation incorporated

under the laws of England and Wales and maintains its principal office at Dansom

Lane, Hull, North Humberside HU8 7DS, England. RBH manufactures and sells various products throughout the United States and the world, including pharmaceuticals. RBH or it subsidizes were duly authorized to conduct business within the Commonwealth of Virginia at all times relevant to this matter.

11.     Reckitt Benckiser Group, P.L.C. ("RBG") is a British Corporation Incorporated under the laws of England and Wales and maintains its principal office at 103-105 Bath Road, Slough, Berkshire, SL1 3UH, England. RBG is a holding company and owns the other Reckitt entities identified herein. It had a market capitalization as of the filing of this Second Amended Complaint of almost $50 billion and total annual sale of more than $14 billion. RBG manufactures and sells various products throughout the United States and the world, including pharmaceuticals. RBG or its subsidiaries were duly authorized to conduct business within the Commonwealth of Virginia at dl times relevant to this RBG and its subsidiaries, including the other Reckitt entities named herein, manufacture market branded products for household use, health and personal care, and sell a range of products through over 60 operating companies into nearly 200 countries. The company's geographical divisions include Europe, North America, Australia and developing markets.

12.     RBI, RBL and RBP are operated by, wholly owned subsidiaries of, RBH and RBG (the terms "Reckitt" and/or "Reckitt Defendant(s)" shall, unless otherwise indicated, include RBI, RBL... RBP, RBH and RBG). The Reckitt Defendants have common ownership, an integrated management structure and their operations and operational plans are intertwined: The managing officers of RBI, RBL and RBP ultimately reported and answered to executives of RBH and RBG at all times relevant to this Complaint.

13.    Indivior Inc. is a Delaware corporation having a principal place of business at 10710 Midlothian Turnpike, Suite 430, Richmond, Virginia. Indivior purports to be a wholly owned subsidiary of Indivior PLC, a corporation organized under the laws of England and Wales. Indivior Inc. is a pharmaceutical company that has been engaged in the manufacture, marketing and sale of Suboxone and Subutex since approximately eight months aner this suit was originally filed in May of 2013. Indivior, Inc. began operations in approximately January of 2014.

14.    Indivior PLC is a public limited company organized under the laws of England and Wales. It maintains its headquarters at 103-105 Bath Road, Slough, United Kingdom. It is a pharmaceutical company that has been engaged in the manufacture, marketing and sale of Suboxone and Subutex since 2014. It is the corporate successor to RBP and was demerged from RBP by actions of RBH and RBG in 2014. It is the corporate parent of Indivior, Inc. It had an initial capitalization of approximately $3 billion and has current total annual revenue of just over $1 billion. Indivior PLC's international headquarters shares the same address as the headquarters of RBH and RBG. Immediately after the demerger was affected, the entire RBP management team assumed roles in the service of Indivior identical to those they held at RBP. Relator asserts, upon information and belief, that the sole purpose or primary purpose of the demerger was for the Reckitt Defendants to shed or reduce liability associated with the conduct complained of herein. For this and other reasons, Relator asserts the Indivior entities are the alter ego of, and responsible for the actions of, RBP, and that the Reckitt Defendants remain responsible for the acts of Indivior, Inc., Indivior PLC and Indivior UK Limited.

15.    Indivior UK Limited is a public limited company organized under the laws of England and Wales. It was formed in 2014. It maintains its headquarters at 103-105 Bath Road, Slough, United Kingdom. Upon information and belief, Indivior UK Limited is a wholly

owned subsidiary of RBE and/or RBG. Pursuant to the demerger agreement, RBH and Indivior UK Limited entered into a supply agreement executed December 23, 2014, but effective on April 1, 2015, Pursuant to the agreement, RBH manufactures the Suboxone product line exclusively for Indivior UK Limited. In turn, Indivior UK Limited is obligated under this agreement to purchase those products exclusively from RBH for a period of seven (7) years, until 2022, which is the year Suboxone film's patent protection expires. Upon information and belief, Indivior UK Limited is engaged in the distribution of Suboxone and Subutex worldwide.

16.     The term "Indivior" shall, unless otherwise indicated herein, mean, jointly and severally, Indivior Inc., Indivior PLC, and Indivior UK Limited. The term "Defendants" shall, unless otherwise indicated, mean, jointly and severally, RBI, RBL, RBP, RBH, RBG, Indivior Inc., Indivior PLC and Indivior UK Limited.

17.     The Defendants manufacture and market, or at times relevant hereto manufactured and marketed, various pharmaceuticals subject to approval of the United States Food and Drug Administration ("FDA") and were responsible for the conduct alleged herein.

## FACTS

18.     The Defendants knowingly and/or with deliberate indifference made or used false or fraudulent statements and schemes, or caused fraudulent statements to be made and unlawful schemes to be carried out by Medical Doctors, and or Psychiatrist... As a result of these false and/or fraudulent statements and schemes, the Plaintiff became aggressively addicted to this product, named *Suboxone and Subutex*. A federal grand jury sitting in Abingdon, Virginia, has indicted Indivior Inc. (formerly known as Reckitt Benckiser Pharmaceuticals Inc.) and

Indivior PLC (Indivior) for engaging in an illicit nationwide scheme to increase prescriptions of Suboxone Film, an opioid drug used in the treatment of opioid addiction, the Department of Justice announced.

19.    According to their indictment, Indivior obtained billions of dollars in revenue from Suboxone Film prescriptions by deceiving health care providers and health care benefit programs into believing that Suboxone Film was safer, less divertible, and less abusable than other opioid-addiction treatment drugs. Indivior also is alleged to have sought to boost profits by using a "Here to Help" program to connect opioid-addicted patients to doctors the company knew were prescribing opioids at high rates and in a clinically unwarranted manner.

20.    The deadly opioid epidemic continues to devastate communities and families across our nation," said Principal Deputy Associate Attorney General Jesse Panuccio of the Department of Justice. "The Department of Justice intends to hold accountable those who are in position to know the harm opioid abuse inflicts, but instead choose to profit illegally from the pain of others. Manufacturers, distributors, pharmacies, and doctors should all be on notice that they must follow the law and act responsibly."

21.    Opioid addiction is a national epidemic. The indictment alleges that, rather than marketing its opioid-addiction drug responsibly, Indivior promoted it with a disregard for the truth about its safety and despite known risks of diversion and abuse," said Assistant Attorney General Jody Hunt. "The Department of Justice is committed to holding opioid manufacturers accountable for such unlawful conduct."

22.     According to the indictment, Indivior developed Suboxone Film around 2007 as a pa-
tent-protected alternative to the tablet form of Suboxone, which was then about to face ge-
neric drug competition. The primary ingredient in both Suboxone Film and tablets is bupren-
orphine, a highly potent opioid. Indivior promoted Suboxone Film as safer and less-divertible
than its tablet form, even though the company lacked any scientific evidence to support those
claims. In particular, Indivior aggressively marketed Suboxone Film, without an established
basis, as having a "lower risk of child exposure" and a "less divertible/abusable formula-
tion." Indivior made these and other false and misleading claims in marketing materials and
through representations to physicians, pharmacists, and health care benefit programs through-
out the country. The indictment also alleges that, to further its scheme, Indivior announced a
"discontinuance" of its tablet form of Suboxone based on supposed "concerns regarding pe-
diatric exposure to" tablets, when in fact Indivior executives knew the primary reason for the
discontinuance was to delay the Food and Drug Administration's approval of generic tablet
forms of the drug.

23.     The indictment further alleges that Indivior used its "Here to Help" internet and tele-
phone program as part of its scheme to induce physicians to write prescriptions for Suboxone
Film. Touted as a resource for opioid-addicted patients, Indivior used the program in part to
connect patients to doctors it knew were prescribing Suboxone and other opioids to more
patients than allowed by federal law, at high doses, and in suspect circumstances. The indict-
ment alleges that Indivior executives and employees knew from statistical and numerous
firsthand reports that some doctors in the Here to Help referral system were issuing prescrip-
tions in a careless and clinically unwarranted manner. I myself used "Here to Help" and

doctors who counseled and prescribed me *Suboxone* not ever knowing how dangerous this drug was. The addiction was far worse and the withdrawal symptoms were twice if not, three times worse than normal prescribed pain killers.

## BACKGROUND

24.     Defendants marketed *Subutex and Suboxone* to be safe, but both are very powerful by prescription only medications that were meant to treat opioid addictions to narcotics such as Oxycontin, Percocet, Vicodin, Methadone and street used Heroin. Please Note… *Suboxone and Subutex* were specifically made for and used to wean opioid addicts off of street drugs known as Scheduled No. 1 and 2 substances and Prescribed Narcotics such as Oxycontin, Vicodin, Percocet, Methadone and or Morphine. Suboxone is a unique composite drug product consisting of two active pharmacological ingredients, buprenorphine (four parts) and naloxone (one part). Subutex contains only buprenorphine.

25.     Buprenorphine provides a maintenance dose of a semi-synthetic opioid which is absorbed through the oral mucosa. Buprenorphine ostensibly has a well-documented "ceiling effect" when taken sublingually which is supposed to make it safer in overdose than other opioids. Defendants marketed these drugs as having a less euphoric effect, being less addictive, being less susceptible to diversion for improper uses, being safer, and having less of a potential for abuse compared to methadone, another drug used to treat opioid addiction. These characteristics ostensibly make it easier and safer to treat addicts and work toward lower doses with a goal of using the lowest optimal dose to avoid withdrawal and craving of opioids.

26.   The naloxone contained within Suboxone ostensibly protects the patient from abusing the drug by blocking the action of the buprenorphine and thereby precipitating withdrawal symptoms when the buprenorphine is taken in any manner other than sublingually. According to the Defendants, the protective characteristics of the naloxone will only activate if it is subjected to the addicts' favored methods of abuse, i.e., dissolved in a solution and injected intravenously or snorted. The naloxone's blocking effect is ostensibly vitiated in Suboxone when taken sublingually, as directed, because naloxone is poorly absorbed through the oral mucosa. In theory, the combination of compounds in Suboxone allows a safer opioid to be substituted for heroin and the more dangerous opioids while blocking the primary abuse and more dangerous pathways of administration.

27.   Reckitt is a consumer and healthcare company based in the United Kingdom. Before and during the Class Period, Reckitt and its most senior executives perpetrate a scheme, which generated over $3 billion in proceeds, to facilitate opiate abuse among U.S. consumers and mislead investors and the public regarding the health and safety risks of Reckitt's key opiate product, Suboxone Film.

28.   Prior to December 2014, the Company maintained a division dedicated to opioid addiction treatments known as Reckitt Benckiser Pharmaceuticals Inc. ("Reckitt Pharma"). For many years, Reckitt Pharma's primary source of revenue was the manufacture and sale of Suboxone Tablets, a treatment for opioid addiction and the predecessor to Suboxone Film.

29.   Because Suboxone Tablets had been granted orphan drug status by the U.S. Food and Drug Administration ("FDA"), Reckitt enjoyed a period of exclusivity during which no generic competitors to Suboxone Tablets could enter the market. This period of exclusivity was set to end in October 2009. While the Company's Suboxone Tablet sales had grown to more than

$260 million, Reckitt feared that it would lose almost all of those revenues to cheaper generics once the exclusivity period ended.

30.     In order to maintain and grow profits, senior executives at Reckitt devised a plan to switch prescribers from Suboxone Tablets to a new proprietary treatment that the Company had been developing: Suboxone Film. Suboxone Film had similar active ingredients to Suboxone Tablets, however it was dispensed in a thin film placed under the tongue and stored in single-use foil wrappings. Executives planned to create a marketing campaign that touted the purported safety benefits of Suboxone Film over Suboxone Tablets in order to prevent generic competition. Key to this campaign was fabricating safety concerns with existing treatments in order to delay the entry and approval of generics for Suboxone Tablets.

31.     For example, internal Company documents discussed the "need to think creatively about a safety story" in order to "tie up generic[s]" and create a "negative safety issue" that could "prevent approval." In 2009, Reckitt Pharma's medical director summarized the plan to exaggerate the safety risks of tablets: *We need to develop a story about childhood exposures to set the stage for switching patients*" to Suboxone Film.[1]

32.     From the start, Reckitt executives planned to market Suboxone Film as a safer treatment "from a public health perspective" with a "less divertible/abusable formulation" and "lower risk of child exposure." Not only were there no scientific studies to support these claims, internal Company documents acknowledged that Suboxone Film could in fact be considered *less safe*, because "there is an incremental risk of the film since once a child ingests the film it will be nearly impossible to remove vs. tablets." In other words, internally the

---

1 Emphasis has been added unless otherwise noted.

Company and its executives recognized that Suboxone Film potentially posed an increased risk of harm to children because once ingested, children would almost invariably suffer exposure to a full dose.

33.     Although the FDA approved Suboxone Film as an opioid addiction treatment in 2010, it rejected the Company's claims that the packaging would protect against diversion and accidental child exposure.  To the contrary, the agency found that Suboxone Film was more susceptible to abuse and posed greater child safety risks than tablets.  Company executives acknowledged that the FDA was "trying to deny us the ability to make a claim on additional pediatric safety of the film."

34.     Despite the FDA's findings, Reckitt decided to launch a "all-out campaign" to switch users to Suboxone Film based on false representations regarding "diversion and misuse and pediatric safety."  This mandate came directly from Reckitt's most senior executives.  For example, in September 2010, the Company's former CEO, Bart Becht, instructed Reckitt Pharma sales personnel to promote Suboxone Film as "*safer*" and to "convert [patients] from tablets to films, thereby protecting our Net Revenues in the USA."  In March 2011, Becht materially and falsely stated in Reckitt's 2010 Annual Report that Suboxone Film was "*better from a child safety point of view, making it more attractive for doctors to prescribe.*"  Similarly, in July 2012, Reckitt's new CEO, defendant Kapoor, oversaw an investor presentation that fraudulently portrayed Suboxone Film as "*less divertible and abusable.*"  Marketing materials approved by Company executives also highlighted Suboxone Film's "advantages," which falsely included "*Public safety – reduced pediatric exposure.*"

**35.**     These and similar misstatements remained alive and uncorrected during the Class Pe-
riod.  Defendants knew, or were reckless in not knowing, that such statements were false and
misleading when made.  In addition to the FDA letter and the Company's own internal anal-
yses, Reckitt received data from contractors it had hired demonstrating that Suboxone Film
was more frequently abused and involved in more accidental child exposures than Suboxone
Tablets.  Similarly, in November 2012, Reckitt Pharma's Medical Director and VP for Clinical
Affairs internally discussed the increased dangers that Suboxone Film posed to children.
Reckitt Pharma's own compliance committee determined that the Company's promotional ma-
terials presented "compliance risks," and Reckitt Pharma managers determined that *"[u]nder
no circumstances"* could the Company truthfully make the claim that Suboxone Film posed
less risk to children.

**36.**     At the same time that Reckitt was flooding the public with higher risk Suboxone Film
under false pretenses, it fabricated a pediatric safety scare with existing treatments to further
spur conversion to its new drug.  In 2012, Reckitt's General Counsel emailed defendant Ka-
poor, Reckitt's CFO defendant Hennah, and other Company executives instructing them not to
"create any emails or other documents" regarding the plan.  Around this time, Reckitt had hired
contractors to study the child safety profile of film versus tablets.  When the contractors con-
cluded that there was no basis to determine that Suboxone Film was safer than Suboxone Tab-
lets, the Reckitt Pharma manager overseeing the project dismissed their interim report as a
"worthless, empty shell."

**37.**     Shortly thereafter, Reckitt discontinued Suboxone Tablets and submitted a petition to
the FDA stating that the reason for the discontinuance was *"due to safety concerns."*  Defend-
ant Kapoor approved the petition, even though he knew the proffered reason was false and that

the real reason was to prevent generic competition. The petition also included an executive summary of the contractors' findings, which had been altered to support the Company's false narrative. Concurrent with this doctored FDA petition, the Company engaged in a massive misinformation campaign to doctors, patients and other healthcare professionals claiming that it had discontinued Suboxone Tablets because of the risks the drug posed to children.

38.     To further increase the sale of Suboxone Film, Reckitt courted physicians that it knew were over-prescribing the drug and/or prescribing it for clinically unwarranted uses. The Company maintained a physician referral program called "Here to Help" that served doctors "like a concierge service." It also provided marketing materials, billing advice and access to lunch and dinner events, even for physicians that it knew were facilitating drug abuse.

39.     Defendants' scheme to fraudulently inflate sales of Suboxone Film was a success. Between 2010 and 2014, the Company's revenues from sales of the drug increased ten-fold to over $840 million annually. This included more than $500 million in payments from Medicare and Medicaid.

40.     Although Reckitt Pharma was spun off from Reckitt in December 2014, becoming a company known as Indivior plc ("Indivior"), the Company and its executives continued to conceal their fraud throughout the Class Period.

41.     Despite defendants' efforts, the truth began to leak out on July 24, 2017, when the Company announced, in connection with its second quarter 2017 financial results, that it had recorded a £318 million charge related to ongoing U.S. Department of Justice ("DOJ") and U.S. Federal Trade Commission ("FTC") investigations into its former Reckitt Pharma

operations. On this news, the price of Reckitt ADSs dropped 5%. Then, on February 19, 2018, Reckitt announced, in connection with its full year 2017 financial results, that it had recorded

an exceptional charge of £296 million due to the investigations, and that the investigation now also involved the California Department of Insurance. On this news, the price of Reckitt ADSs declined more than 10%. Finally, on April 9, 2019, the DOJ filed a criminal indictment against Reckitt Pharma (now Indivior), which detailed a multi-billion-dollar scheme to defraud the public and the Company's investors through the marketing and sale of Suboxone Film. On this news, the price of Reckitt ADSs again declined over 6%.

42.     Ultimately, Reckitt agreed to settle the federal investigations into its marketing and sale of Suboxone Film for $1.4 billion. At the time, the settlement was called the "largest opioid settlement in US history."

## DEFENDANTS' FALSE AND MISLEADING
## STATEMENTS AND OMISSIONS

43.     Prior to and throughout the Class Period, defendants artificially inflated the trading price of Reckitt ADSs by issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, set forth below, not false and misleading. The Class Period begins on July 28, 2014. On that date, Reckitt issued a press release announcing its financial results for the first half of fiscal 2014 ("1H14 Release"). The 1H14 Release stated that Reckitt had achieved net revenues of £4.7 billion, operating profit of more than £1 billion and net income of over £800 million for the first 26 weeks which most of that was sales from the *Suboxone* film. Par.

44.     Date State Report 9/1/2010. NY. INDIVIOR sales representative told physicians that Suboxone Film "offers increased protection against misuse/abuse/diversion and pediatric exposure. Due to this, and the fact that patients will be able to get the film at no cost, they have all stated that they will prescribe the Film when it is available.  Most pharmacists have also been impressed with the new formulation and the steps the company has taken to decrease diversion and pediatric exposure"

45.     9/10/2010 NC. INDIVIOR sales representative told a physician that Suboxone Film "offers greater protection against pediatric exposure & misuse/diversion.

46.     9/30/2010 SC. INDIVIOR sales representative met with a physician and "discussed pediatric exposure & tablet diversion as reasons for MD to insist that pts switch from tablet to film"

47.     12/16/2010 MI. INDIVIOR sales representatives told physicians that Suboxone Film is the "safest choice," has "less chance of inadvertent use by kids," can "protect the community;" and can "protect office-based treatment "from being banned.

48.     12/21/2010 CA. INDIVIOR sales representative told physicians that Suboxone Film "is a better safer medication" and "it would be unethical or inappropriate for us to promote· the tablet now that we have a better, safer product"

49.     12/22/2010 MI. INDIVIOR-paid speaker told physicians that her "big plus for the Film was the packaging and therefore making it a safer product for the community"

50.     12/22/2010 TN. INDIVIOR sales representative told physicians that during the holiday season, Suboxone Film gives patients "added comfort in knowing their medication is safer to have in the home as family and friends with small children will be visiting mor~"

51.     1/6/2011 MI. INDIVIOR sales representative met with a physician who was "in the category of trying out the film but not yet sold on it," and stated that "it's important [for the physician] as a physician and mom to convert patients to the Film. The fact that film helps to protect [ office-based opioid treatment] and reduces pediatric exposure appeared hard to ignore for the doctor. Hopefully that message will have a louder voice in her head than the patients telling her they are 'happy' with the tablet.

52.     1/11/2011 CA. INDIVIOR sales representative told physician and pharmacists that Suboxone Film is a "safer product vs tablet.

53.     2/3/2011 IN. INDIVIOR sales representative told a physician that patients who request tablets do so "in order to divert them. [The physician] said that he may have become a bit too trusting in his several years of treat[ing] patients. We spoke about how the Film can 'weed out' those patients truly not committed to recovery. He promised to convert ALL patients to Film"

54.     2/3/2011 UT. Physicians told an INDIVIOR sales representative that patients were "complaining about the Film and asking to be put back on the tablet." INDIVIOR sales induce them to prescribe and dispense Suboxone Film, and recommend the prescribing and dispensing of Suboxone Film:2

55.     2/09/2011 INDIVIOR sales representative told physicians "that many other doctors are going 'film only' because they want to provide the best quality care to their patients with the most efficacious, safest, and cost saving treatment and it has influenced several of them and they then have been interested in how others are doing this, how patients are responding, etc.

I believe it makes them feel more confident to know that others are doing this and it also makes them want to do the same to keep up with 'quality care' physicians

56.     INDIVIOR continued to include physicians it knew were issuing careless, clinically unwarranted opioid prescriptions in the Here to Help and Treatment Advocate programs, and otherwise market Suboxone Film to them. On or about the stated dates, the identified INDIVIOR executives, employees, and agents communicated the information described below relating to aiding, abetting, counseling, commanding, inducing, and procuring Doctor A, located in or around Cedar Bluff, Galax, and Willis, Virginia, to switch prescriptions to Suboxone Film where Doctor A exceeded the maximum number of patients allowed at a time, where daily doses exceeded the maximum indicated for additional clinical advantage, and where prescriptions were issued in a careless arid clinically unwarranted manner:

57.     7/17/2008 INDIVIOR Risk Email: INDIVIOR Risk Mgr. suspected that Doctor A's clinic Mgr. to INDIVIOR was one of two possible sources of "1 to 2 controlled buys of Med. Advisor Suboxone per week" by law enforcement.

58.     4/9/2009 INDIVIOR Risk Received statistical-report: Doctor A prescribed buprenorphine and others containing drugs to 805 individuals in February 2009, at daily doses higher than 24 mgs of buprenorphine to 428 of those individuals

59.     8/28/2009 *INDIVIOR Sales Spvsr. Firsthand report:* Doctor A intentionally mislabeled prescriptions for buprenorphine-containing drugs as being for pain management, when also pre-scribed for opioid addiction, to evade detection for violating the DATA patient limit.

60.     4/30/2010, "Here to Help" Here to Help operators referred opioid-addiction/dependence patients to Doctor A; using lists of enrolled prescribers in the patients' geographic areas.

61.     2011 INDIVIOR Sales Reports: met with Doctor A at least 28 times to encourage Doctor A to prescribe Suboxone Film.

62.     5/1/2012 "Here to Help" Here to Help operator referred an opioid-addiction/dependence patient to Doctor A, using a list of enrolled prescribers in the patient's geographic area.

63.     5/10/2012 INDIVIOR Sales Email: successfully convinced Doctor A to switch to prescribing Suboxone Film, as "Basically I lived with [Doctor Med. Advisor A] last fall, seeing her once or twice a week, every week, even Saturdays; and eventually it paid off and her share of tablet vs film completely flip flopped.

64.     4/12/2013, "Here to Help" Here to Help operators referred opioid-addiction/dependence patients to Doctor A, using lists of enrolled prescribers in the patients' geographic areas.

65.     9/10/2013 INDIVIOR Sales Firsthand report: Doctor A is massively over cap [the maximum patient limit allowed under the DAT A] she also overdoses .... This has been an ongoing problem since I started that only continues to get worse.

66.     12/13/2013, "Here to Help" Here to Help operators referred opioid-addiction/dependence patients to Doctor A, using lists of enrolled prescribers in the patient's geographic areas.

## DAMAGES

67.     As a result of the foregoing unlawful and wrongful but willing acts through and by the Defendants, the Plaintiff has been caused to suffer general damages which includes but are not limited to the following physical and emotional injury, including but not limited to emotional and mental distress, personal humiliation and shock.

68.     Said injuries have caused the Plaintiff to incur special damages.

69.     In addition, Mr. Adams prays for punitive damages against Reckitt Benckiser I.N.C. ("R.B.I.") Punitive damages are designed to punish and deter persons such as Defendants who has engaged in egregious wrongdoing. Punitive damages may be assessed when a Defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to others.  Therefore, Mr. Adams alleges and prays for punitive damages against Reckitt Benckiser INC. as such Defendants actually knew that their conduct was callously indifferent to its legality.

**WHEREFORE PREMISES CONSIDERED, Mr.** Adams prays that upon trial of the merits, he recovers compensatory damages against Defendants, and that Mr. Adams also recovers punitive damages against the Defendants in an amount to be determined by jury to punish and/or deter and to make an example of those Defendants in order to prevent similar future conduct; and that Mr. Adams recover against Defendants all reasonable and necessary fees, court costs and expenses in regards to the present suit in litigation. Moreover, Mr. Adams prays for all pre-judgement and post judgement interest that can be assessed against the Defendants in the event of recover; and that Mr. Adams recover against each Defendants any and all other general or specific relief to which he proves himself justly entitled.

*Respectfully Submitted,*

adamscarpet@cableone.net

Marcus E. Adams Jr Pro se.

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of these Documents has been forwarded acceptable by law to the Defendant in accordance with Federal Rules of Civil Procedure on this 06th day of October, 2020

**RECKITT BENCKISER, INC. (R.B.I.)**
Morris Corporate Center IV, 399
Interpace Parkway,
Parsippany, New Jersey 07054

adamscarpet@cableone.net
Marcus E Adams Jr. Pro Se
O 361.815.6725
C 361.815.8724